No. 05-591C
(Judge Baskir)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WILLIAM L. CENTERS,

Plaintiff,

v.

THE UNITED STATES

Defendant.

---

# PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

---

STEVEN D. GORDON
Holland & Knight LLP
2099 Pennsylvania Avenue, N.W.
Suite 100
Washington, D.C. 20006
Phone: (202) 955-3000
Facsimile: (202) 955-5564

February 22, 2006

*Counsel for Plaintiff*

# TABLE OF CONTENTS

STATEMENT OF FACTS .......... 1
ARGUMENT .......... 6
I. THE COURT HAS JURISDICTION OVER THIS ACTION .......... 6
II. THIS ACTION IS NOT BARRED BY THE STATUTE OF LIMITATIONS .......... 9
CONCLUSION .......... 13

## TABLE OF AUTHORITIES

**FEDERAL CASES:**

*Brighton Village Associates v. United States*, 52 F.3d 1056 (Fed. Cir. 1995) .......... 10

*Cedars-Sinai Medical Center v. Watkins*, 11 F.3d 1573 (Fed. Cir. 1993) .......... 2

*Goodman v. Niblack*, 102 U.S. 556 (1880) .......... 7

*Insurance Co. of the West v. United States*, 243 F.3d 1367 (Fed. Cir. 2001) .......... 6

**National Australia Bank v. United States*, 54 Fed. Cl. 238 (2002) .......... 8, 9

**Novo Trading Corp. v. CIR*, 113 F.2d 320 (2d Cir. 1940) .......... 8

**Oceanic Steamship Co. v. United States*, 165 Ct. Cl. 217 (1963) .......... 10

*SAB Construction, Inc. v. United States*, 66 Fed. Cl. 77 (2005) .......... 12

**Terteling v. United States*, 334 F.2d 250 (Ct. Cl. 1964) .......... 11, 12

*United States v. Aetna Casualty & Surety Co.*, 338 U.S. 366 (1949) .......... 7, 8

*United States v. Improved Premises Located at Northwest Corner of Irving Place and Sixteenth Street*, 204 F. Supp. 868 (S.D.N.Y. 1962) .......... 8

**FEDERAL STATUTES:**

12 U.S.C. § 1715w .......... 3

28 U.S.C. § 1491 .......... 6

28 U.S.C. § 2501 .......... 9, 12

31 U.S.C. § 3727 .......... 6

**FEDERAL REGULATIONS:**

24 C.F.R. Part 202 .......... 2

24 C.F.R. § 207.258 .......... 4

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| WILLIAM L. CENTERS, *Plaintiff,* | ) | |
| v. | ) | No. 05-591C (J. Baskir) |
| THE UNITED STATES, *Defendant.* | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Plaintiff William Centers ("Mr. Centers") through counsel, respectfully opposes the motion to dismiss filed by defendant United States ("Government"), relying on the following points and authorities.

**STATEMENT OF FACTS**

This case involves a claim for a supplemental mortgage insurance payment from the United States Department of Housing and Urban Development ("HUD"). The mortgage insurance claim was originally filed in 1992 but, because of belated and protracted state court litigation in Indiana instituted by a third party, the claim for a supplemental payment did

not ripen until April of 2001 and HUD did not finally deny the claim until 2003.

Centennial Mortgage, Inc. ("Centennial") is a Missouri corporation which maintains its principal place of business in Indiana. Since at least 1986 Centennial has been a mortgagee approved for participation in HUD mortgage insurance programs in accordance with 24 C.F.R. Part 202. Complaint ("Compl.") ¶ 4.[1]

Until August 1, 2000, Mr. Centers was the President and sole shareholder of Centennial. At that time, Mr. Centers sold all the outstanding stock in Centennial to Matthew T. Kane. Under the terms of the sale, Centennial distributed to Mr. Centers, prior to closing, all of its assets and properties including the claim asserted in this action. Compl. ¶ 5.

On January 18, 1989, Centennial entered into a Building Loan Agreement with two parties (the "Developers") to renovate a motel into a residential care facility in Lake County, Indiana (the "Project"). Under the terms of the Building Loan Agreement, Centennial loaned the Developers

---

[1] In ruling on the Government's Rule 12(b)(1) motion, the allegations of the complaint are taken as true and construed in a light most favorable to Mr. Centers. *See Cedars-Sinai Medical Center v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993).

$2.27 million for construction of the Project (the "Loan"). The Loan was evidenced by a note ("Note") executed by the Developers and endorsed by HUD, which Note was secured by a mortgage/deed of trust ("Mortgage") on the Project. Compl. ¶ 6.

HUD insured the Loan pursuant to Section 232 of the National Housing Act, 12 U.S.C. § 1715w, as evidenced by HUD's endorsement of the Note, and HUD prescribed the form of the Building Loan Agreement, Note, Mortgage and related documents pertaining to the Loan. HUD's endorsement of the Note created a contract of insurance between HUD and Centennial. Compl. ¶ 7.

HUD required the general contractor for the Project to provide $237,760.20, or a letter of credit in lieu thereof, as security against default. When the general contractor was unable to do so, David Blumenfeld, a principal of one of the Developers, caused a letter of credit to be issued in the requisite amount (the "Letter of Credit"). The general contractor executed a HUD-prescribed Completion Assurance Agreement with Centennial that authorized Centennial to draw on the Letter of Credit in certain circumstances. Compl. ¶ 8.

The Developers defaulted on the Loan, and Centennial notified HUD of the default by letter dated December 31, 1991. (Appendix to Joint

Preliminary Status Report ("App.") at 1). Pursuant to the contract of insurance, specifically 24 C.F.R. § 207.258(b)(iv), the undrawn balance on the Letter of Credit was either to be retained by Centennial or delivered to HUD in accordance with instructions issued by HUD at the time the insurance claim is filed. Compl. ¶ 12. Accordingly, Centennial inquired, in a December 31, 1991 letter to HUD, "Please advise whether your office would prefer that we draw on the letter of credit, or assign it to HUD." App. 1. In January 1992, HUD responded to Centennial and stated "We suggest you draw on the letter of credit. However, this must be your decision. Please be advised that in the event of an insurance claim to FHA, HUD will deduct the $237,700 secured by the letter of credit from your claim." App. 2; Compl. ¶ 9.

Centennial subsequently filed a mortgage insurance claim with HUD and assigned the Loan to HUD as of July 30, 1992. Centennial drew $212,105.26 on the Letter of Credit, and HUD reduced its payment on Centennial's insurance claim by this amount. Compl. ¶¶ 10, 12.

In July 1992, the general contractor and Blumenfeld filed an Indiana state-court complaint against Centennial, requesting the court to enjoin Centennial from drawing on the Letter of Credit. The trial court denied the injunction. Compl. ¶ 11.

Three years later, in August 1995, Blumenfeld filed an amended complaint in Indiana state court against Centennial alleging breach of contract and conversion for drawing on the Letter of Credit. Five years thereafter, following a trial in February 2000, the jury awarded the plaintiff $120,000, representing a portion of the amount drawn on the Letter of Credit, plus pre-judgment and post-judgment interest. The trial court entered judgment for $193,890 against Centennial. Centennial appealed and the Indiana Court of Appeals affirmed the trial court's judgment on April 3, 2001. Centennial then paid $202,730.33 (the amount of the judgment plus additional accrued interest) to satisfy the judgment. Compl. ¶¶ 13, 14.

On or about March 8, 2000 (i.e. after the Indiana jury verdict but before the appeal), Centennial filed a request with HUD to supplement or amend its insurance claim to compensate for the Indiana state court judgment. Centennial also sought reimbursement of its legal fees and expenses of approximately $28,000. HUD denied Centennial's request by letter dated June 7, 2000. Centennial continued requesting payment from HUD from 2000 through 2003. By letters dated June 23, 2003 and December 20, 2003, HUD again denied Centennial's request for a supplemental payment. Compl. ¶ 15.

## ARGUMENT

### I. The Court Has Jurisdiction Over this Action

The Government's initial argument is that the doctrine of sovereign immunity bars this suit because Mr. Centers has not established the existence of a contract between him and the United States. This argument is wide of the mark. The requisite waiver of sovereign immunity is furnished by the Tucker Act, 28 U.S.C. § 1491. As the Federal Circuit noted in *Insurance Co. of the West v. United States*, 243 F.3d 1367, 1371-74 (Fed. Cir. 2001), the Tucker Act waives sovereign immunity "as to claims [founded upon contract], not particular claimants." *Id.* at 1373-74. The court went on to hold that "the Tucker Act must be read to waive sovereign immunity for assignees as well as those holding the original claim, except as barred by a statutory provision such as the Anti-Assignment Act." *Id.* at 1375.

Thus, the only issue here is whether this action is barred by the Anti-Assignment Act ("Act"), 31 U.S.C. § 3727. The answer plainly is no. The assertion of Centennial's claim by Mr. Centers – who was the President and sole shareholder of Centennial from the inception of relevant events until after the initial request to supplement or amend the insurance claim

was filed with, and denied by, HUD -- does not contravene the Act or offend its underlying policies.

The leading Supreme Court decision analyzing the Act is *United States v. Aetna Casualty & Surety Co.*, 338 U.S. 366 (1949). The Court observed that the Act was originally enacted in 1853 as part of a statute to prevent frauds upon the Treasury of the United States. The purpose of the Act, the Court said, is as follows:

> Its primary purpose was undoubtedly to prevent persons of influence from buying up claims against the United States, which might then be improperly urged upon officers of the Government. Another purpose ... has been inferred by the Court from the language of the statute. That purpose was to prevent possible multiple payment of claims, to make unnecessary the investigation of alleged assignments, and to enable the Government to deal only with the original claimant.

338 U.S. at 373 (citations omitted).

Initially the Act was construed strictly but "[t]he rigor of this rule was very early relaxed in cases which were thought not to be productive of the evils which the statute was designed to obviate." *Id.* The Court quoted with approval its discussion of the Act's ambit in *Goodman v. Niblack*, 102 U.S. 556, 560 (1880):

> [W]e held [the Act] did not include a transfer by operation of law, or in bankruptcy, and we said it did not include one by will. The obvious reason for this is that there can be no purpose in such cases to harass the government by multiplying the number of persons with whom it has to deal, nor any danger of

> enlisting improper influences in advocacy of the claim, and that the exigencies of the party who held it justified and required the transfer that was made.

338 U.S. at 376.

Accordingly, it is well established that the Act "does not prohibit assignments to stockholders of a closely held corporation in the course of distribution." *United States v. Improved Premises Located at Northwest Corner of Irving Place and Sixteenth Street*, 204 F. Supp. 868, 871 (S.D.N.Y. 1962) (collecting cases). In this situation, "[t]he assignment only passed legal title to parties who already owned the entire beneficial interest in the claim. Such an assignment is not within the evils at which the prohibitions of the statute are directed." *Novo Trading Corp. v. CIR*, 113 F.2d 320, 322 (2d Cir. 1940).

Recently, this Court was presented with facts analogous to this case in *National Australia Bank v. United States*, 54 Fed. Cl. 238 (2002). There a parent corporation retained the claims of two wholly owned subsidiaries when those subsidiaries were sold. The Court ruled that this did not run afoul of the Act. The Court reasoned that the parent company's retention of the claims did not implicate any of the purposes underlying the Act because (i) there was no suggestion that the parent hoped to wield undue influence, (ii) the government had, for all practical purposes, only dealt with

one set of plaintiffs in the matter, and (iii) the government lost none of its defenses through the substitution. 54 Fed. Cl. at 239-40.

The reasoning in *National Australia Bank* is equally applicable here. There is no issue of Mr. Centers wielding undue influence by pursuing the claim in his own name rather than through Centennial. For all practical purposes, the Government continues to deal with the same plaintiff – Mr. Centers – as it did before when Centennial held the claim. Nor does the Government lose any defenses through the substitution of Mr. Centers for Centennial. All that has happened, in the apt words of the Second Circuit in *Novo*, is that legal title to the claim has been passed to the party who already owned the entire beneficial interest in the claim. Thus, this action is not barred by the Anti-Assignment Act.

## II. This Action is Not Barred by the Statute of Limitations

The Government's alternative argument that this action is barred by the statute of limitations, 28 U.S.C. § 2501, is also mistaken. The premise for this argument is the contention that Centennial's breach of contract claim accrued in December 1993, when HUD paid Centennial's insurance claim after reducing it by the amount ($212,105.26) that Centennial drew on the Letter of Credit. This premise is erroneous.

The Government correctly states the rule that a claim first accrues for purposes of the statute of limitations "when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." *Brighton Village Assocs. v. United States*, 52 F.3d 1056, 1060 (Fed. Cir. 1995). In this case, all the events that fix the liability of the Government did not occur until (i) the Indiana courts resolved the extent to which Centennial could properly draw on the letter of credit (on April 3, 2001), and (ii) HUD thereafter denied Centennial's request to supplement or amend its insurance claim (by letters dated June 23, 2003 and December 20, 2003).

"[W]here a claim is based upon a contractual obligation of the Government to pay money, the claim first accrues on the date when the payment becomes due and is wrongfully withheld in breach of the contract." *Oceanic Steamship Co. v. United States*, 165 Ct. Cl. 217, 225 (1963). In *Oceanic*, the plaintiff's contractual claim for an operating-differential subsidy for 1947 did not become due and payable until after a final accounting for that year had been accomplished between the plaintiff and the administrative agency. That final accounting did not occur until 1956-1957. Accordingly, the Court of Claims held that the plaintiff's suit for unpaid portions of the subsidy, which was commenced in 1962, was timely.

Another precedent even more similar to this case is *Terteling v. United States*, 334 F.2d 250 (Ct. Cl. 1964), which also involved a situation where the plaintiffs' claim against the Government did not ripen until protracted litigation with third parties was completed. The plaintiffs in *Terteling* had constructed an air base during World War II pursuant to a contract in which the government agreed to provide gravel pit sites without cost to the contractors. (The government subsequently condemned the gravel pit sites and paid the landowners). In 1946, some three years after completion of the work and acceptance thereof by the government, the former owners of the gravel pit sites brought suit against the contractors seeking damages for the gravel taken from their lands.

The contractors notified the government of the suits, requested assistance in defending them, and advised the government that they expected to be reimbursed for any expenses or damages incurred in defending the suits. The litigation dragged on for over a decade. A judgment in favor of the contractors became final in 1957.

In 1960, the contractors filed suit against the government for reimbursement of their litigation expenses. The Court of Claims ruled that the action was timely because the contractors' claim had not accrued until 1957 when the litigation ended -- only then could the contractors determine

the total amount of the litigation expenses. 334 F.2d at 254. The "contractors had the right to wait until their full obligations were ascertainable before bringing suit therefor." *Id.* at 255; *see also SAB Construction, Inc. v. United States*, 66 Fed. Cl. 77, 87-88 (2005) (claim for breach of contract does not accrue for limitations purposes until the damages are incurred, even though that may involve a long delay).

Here, as in *Oceanic* and *Terteling*, the amount of Centennial's supplemental/amended claim, if any, could not be determined until the Indiana litigation finally concluded. This did not occur until 2001. Even then, the claim did not accrue until HUD thereafter withheld payment in breach of the contract of insurance. Thus, this action was instituted well within the six year limitations period established by 28 U.S.C. § 2501.

## CONCLUSION

For the foregoing reasons, it is respectfully submitted that the Government's motion to dismiss should be denied.

Respectfully submitted,

s/Steven D. Gordon
STEVEN D. GORDON
Holland & Knight LLP
2099 Pennsylvania Avenue, N.W.
Suite 100
Washington, D.C. 20006
Phone: (202) 955-3000
Facsimile: (202) 955-5564
steven.gordon@hklaw.com

February 22, 2006

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 22th day of February, 2006, a copy of the foregoing Plaintiff's Opposition to Defendant's Motion to Dismiss was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Steven D. Gordon

# 3592643_v1