# In the United States Court of Federal Claims

Case No. 05-591C
(Filed: June 1, 2006)
**(To Be Published)**

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * * * | * | |
| **CENTERS,** | * | Breach of contract; assignment of |
| *Plaintiff,* | * | claims; Anti-Assignment Act; privity |
| | * | of contract |
| v. | * | |
| | * | |
| **THE UNITED STATES OF AMERICA,** | * | |
| *Defendant.* | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * * * * | * | |

***Steven D. Gordon,*** Holland & Knight, LLP, Washington, D.C., attorney of record for Plaintiff.

***John S. Groat***, Commercial Litigation Branch, Department of Justice, Washington, D.C., attorney of record for Defendant. With him on the briefs were ***David M. Cohen***, Director, ***Brian M. Simkin***, Assistant Director, and ***Peter D. Keisler***, Assistant Attorney General.

***William Lane***, Department of Housing and Urban Development, Washington, D.C., Of Counsel for Defendant.

***Stephanie Wilson***, law clerk.

## ORDER/OPINION

**Baskir, Judge.**

Plaintiff William Centers is the former President and former sole shareholder of Centennial Mortgage, Inc. ("Centennial"). Mr. Centers brought this breach of contract claim as an assignee of a claim originally belonging to Centennial. Mr. Centers alleges that under a contract of insurance between the Department of Housing and Urban

Development ("HUD") and Centennial, HUD is obliged to reimburse Centennial for certain expenses incurred in connection with the insured transaction. The United States filed a Motion to Dismiss for lack of jurisdiction, arguing that there is no privity of contract between Mr. Centers and the United States and that this action is barred by the statute of limitations.

We conclude that this Court does not have jurisdiction because Mr. Centers lacks standing to enforce the contract between HUD and Centennial. **Therefore, Defendant's Motion to Dismiss is granted.**

## BACKGROUND

### I. Centennial's Contract of Insurance with HUD

Centennial participated in the HUD mortgage insurance programs in accordance with 24 C.F.R. Part 202. Pl. Br. at 2. In 1989, Centennial entered into a Building Loan Agreement with two parties ("Developers") to renovate a motel into a residential care facility in Indiana. Consolidated Statement of Uncontroverted Facts ("CSUF") ¶ 1. According to the terms of the Building Loan Agreement, Centennial loaned the Developers $2.27 million for construction of the project. *Id.* HUD insured the Note and Mortgage against default pursuant to Section 232 of the National Housing Act. CSUF ¶ 2. HUD's endorsement of the Note created a contract of insurance between HUD and Centennial. *Id.*

HUD required that the general contractor provide $237,760.20 cash or a letter of credit for that amount. CSUF ¶ 3. David Blumenfeld, president of one of the Developers, caused a letter of credit to be issued to Centennial as security against default. *Id.* The Completion Assurance Agreement authorized Centennial to draw on the letter of credit in certain circumstances. *Id.*

The Developers defaulted on the loan and Centennial contacted HUD about filing a claim for mortgage insurance benefits. CSUF ¶ 4. In January 1992, HUD responded to Centennial and stated:

> We suggest you draw on the letter of credit. However, this must be your decision. Please be advised that in the event of an insurance claim to FHA, HUD will deduct the $237,700 secured by the letter of credit from your claim.

CSUF ¶ 5; J. App. at Tab 5. Centennial filed a mortgage insurance claim for the full amount of $2,158,197.72 with HUD and assigned the loan to HUD on July 30, 1992. CSUF ¶ 6; J. App. at Tab 6.

Also in July 1992, the general contractor and Mr. Blumenfeld filed a complaint against Centennial in Indiana state court seeking to enjoin Centennial from drawing on the letter of credit. CSUF ¶ 7. A trial court ultimately denied the injunction. *Id.* Centennial then drew $212,105.26 on the letter of credit, and HUD reduced its payment on Centennial's insurance claim by this amount. CSUF ¶ 8, 9. In December 1993, HUD settled Centennial's insurance claim for $1,851,095.11, which was the amount of Centennial's claim decreased by the amount secured by the letter of credit and by other adjustments. CSUF ¶ 9; J. App. at Tab 6. The United States contends that the HUD payments triggered the statute of limitations.

## II. Indiana State Court Litigation

In August 1995, Mr. Blumenfeld filed an amended complaint against Centennial in Indiana state court alleging breach of contract and conversion for Centennial's drawing on the letter of credit. CSUF ¶ 10. After a trial in February 2000, a jury awarded Mr. Blumenfeld $120,760, representing approximately half of the amount drawn on the letter of credit, *see* Oral Argument Transcript ("OA Tr.") at 6-7, and entered a judgment of $193,891 against Centennial, which included the damage award, prejudgment interest, and costs of the litigation. CSUF ¶ 10. Centennial appealed and the Indiana Court of Appeals affirmed the trial court's judgment on April 3, 2001. *Centennial Mortgage, Inc. v. Blumenfeld*, 745 N.E.2d 268 (Ind. App. 2001). After the Court of Appeals affirmed, Centennial satisfied the judgment of $202,730.33, which was the amount of the judgment plus the further accrued interest. Pl. Br. at 5.

## III. Centennial's Claim and the Agreements Between Centennial, Kane and Centers

In March 2000, after the state trial court judgment but prior to the appeal, Centennial filed its first request with HUD to supplement or amend its earlier insurance claim to compensate for the Indiana state court judgment and for reimbursement of its legal fees and expenses in defending against the suit. CSUF ¶ 11. HUD first denied Centennial's request by letter on June 7, 2000. CSUF ¶ 11. This represents an alternative trigger date for the statute of limitations.

Mr. Centers was the President and sole shareholder of Centennial until August 1, 2000. CSUF ¶ 12. On that date, Mr. Centers, Matthew Kane, and Centennial executed a Stock Purchase Agreement under which Mr. Centers sold to Mr. Kane all of the outstanding shares of Centennial's stock. *See* Stock Purchase Agreement ¶ 1, J. App. at Tab 7. Under the Stock Purchase Agreement, Centennial distributed to Mr. Centers almost all of its assets and properties, including "all chose in action (all rights recoverable by lawsuit by [Centennial] pertaining to matters arising prior to Closing)." *Id.* at ¶ 5. This included the claim against HUD. Centennial retained various licenses, permits and authorizations issued by HUD, and pending loan agreements between HUD and Centennial. *Id.*

As part of the transaction, Mr. Centers and Centennial executed a Bill of Sale and Assignment and Assumption Agreement. *See* Assignment Agreement, J. App. at Tab 8. This agreement stated that Centennial "hereby sells, transfers, assigns and conveys to Centers all of [Centennial's] rights, title and interest in and to all of the assets and properties of [Centennial]," again excepting various licenses, permits and authorizations issued by HUD, and pending agreements between HUD and Centennial. *Id.* The assignment included "all chose in action (all rights recoverable by lawsuit by [Centennial] pertaining to matters arising prior to Closing)." *Id*. Again, there is no dispute that this transfer to Mr. Centers included the claim against HUD.

Despite these Agreements, Centennial continued to request supplemental payment from HUD from 2000 through 2003. CSUF ¶ 11. HUD denied these subsequent requests for reimbursement by letters dated June 23, 2003, and December 20, 2003. *Id*.; J. App. at Tabs 9, 11. Plaintiff contends that the statute of limitations was not triggered until the December 2003 rejection by HUD. *See* Pl. Br. at 10.

## IV. Centers' Lawsuits

Notwithstanding the purported transfer of the claims in the August 2000 transaction, Mr. Centers filed suit against Centennial and Mr. Kane in February 2004, in the U.S. District Court for the Northern District of Indiana. Mr. Centers sought an order requiring Centennial to sue HUD for the supplemental payment on its insurance claim. Interestingly, at one point Mr. Centers contended that the doctrine of contract privity prevented him as assignee from enforcing directly the claim against HUD. *See Centers v. Centennial Mortgage, Inc.*, 398 F.3d 930, 932 (7th Cir. 2005).

The district court dismissed Mr. Centers's complaint against Centennial. *Centers v. Centennial Mortgage, Inc.*, No. 04-0153 (N.D. Ind. June 3, 2004), J. App. at Tab 13. Mr. Centers appealed, and in February 2005, the Seventh Circuit held that Centennial's claim against HUD for supplemental payment of the insurance claim and related fees is a chose in action assigned to Mr. Centers, and that the agreement between Mr. Centers and Centennial did not oblige Centennial to pursue a claim against HUD. 398 F.3d at 935-36.

In March 2005, following the Seventh Circuit's decision, Mr. Centers and Centennial entered into a Stipulated Declaratory Judgment, to which HUD was not a party. Stipulated Declaratory Judgment, *Centers v. Centennial Mortgage, Inc.*, No. 04-0153 (N.D. Ind. March 30, 2005), J. App. at Tab 14. The Stipulation stated that Mr. Centers was entitled to receive any proceeds recovered as a result of a claim by Centennial against HUD for a supplemental payment of $202,730.23, but that Centennial was not obliged to assist Mr. Centers in pursuing the claim. *Id.*

Finally, on June 1, 2005, Mr. Centers filed this suit for the supplemental payment of $202,730.23 plus $28,000 in legal fees and expenses pursuant to the Indiana state court litigation. Mr. Centers alleges that under the contract of insurance between HUD and Centennial, HUD is obliged to reimburse Centennial for its losses arising from HUD's instruction to Centennial to draw on the letter of credit. Compl. ¶ 16. Mr. Centers also alleges that Centennial is "entitled to receive the debenture interest rate on the additional mortgage insurance benefits from the time of payment of the original claim until this suit is resolved," and "to recover its attorney fees and expenses in the Indiana state court litigation." Compl. ¶¶ 17, 18. Mr. Centers claims that Centennial's entitlement to bring this action and recover the amounts Centennial is owed was transferred to him in the August 2000 transaction. Compl. ¶ 19.

## DISCUSSION

### I. Standard of Review

This case comes before the Court on Defendant's Motion to Dismiss for lack of jurisdiction. Defendant contends that this Court does not have jurisdiction over Plaintiff's claim because Plaintiff is not in privity of contract with the Government. On motions to dismiss, "[t]he court must accept as true the facts alleged in the complaint and must construe such facts in the light most favorable to the pleader." *Patton v. United States*, 64 Fed. Cl. 768, 773 (2005). Because the Defendant's motion to dismiss challenges this Court's subject matter jurisdiction, it is "incumbent upon [the plaintiff] to come forward with evidence establishing the court's jurisdiction. [The plaintiff] bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence." *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).

### II. Jurisdiction

Plaintiff's claim is based upon a contract of insurance between Centennial and the United States. This Court may only hear claims brought against the United States if Congress specifically and unambiguously waived the government's sovereign immunity for such a suit. *United States v. King*, 395 U.S. 1, 4 (1969). This Court has jurisdiction over breach of contract claims under the Tucker Act, which waives sovereign immunity for "any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1); *see Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (noting that the Tucker Act "confers jurisdiction upon the Court of Federal Claims over the specified categories of actions brought against the United States, and . . . waives the Government's sovereign immunity for those actions").

While as a general statement this Court has jurisdiction over claims founded in contract, Defendant asserts that the doctrine of sovereign immunity bars Plaintiff's suit because Plaintiff cannot show that he is in privity of contract with the United States.

Moreover, Defendant claims that Centennial's assignment of the claim violates the plain language of the Anti-Assignment Act. Def. Br. at ix. To survive Defendant's Motion to Dismiss, Plaintiff must establish that Congress waived sovereign immunity for breach of contract claims brought by an assignee in his position. *See Reynolds*, 846 F.2d at 748.

Plaintiff contends that he has standing to bring this suit because the Tucker Act waives sovereign immunity as to contract claims rather than only for specific claimants. Pl. Br. at 6 (citing *Ins. Co. of the West v. United States*, 243 F.3d 1367,1373-74 (Fed. Cir. 2001)). Plaintiff further argues that Centennial's assignment of the claim to Plaintiff does not violate the Anti-Assignment Act as properly applied. Pl. Br. at 9 (*citing Nat'l Austl. Bank v. United States*, 54 Fed. Cl. 238, 239-40 (2002)). We disagree with Plaintiff's argument on both accounts.

### A. Privity of Contract

Defendant argues that a plaintiff who wishes to bring suit against the United States for a breach of contract must establish that he is in privity of contract with the United States or that his suit falls within one of the limited exceptions to this rule. Def. Br. at ix-x; *see also S. Cal. Sav. & Loan v. United States*, 422 F.3d 1319, 1328 (Fed. Cir. 2005) (citing *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1289 (Fed. Cir. 1999)); *AG Route Seven P'ship v. United States*, 57 Fed. Cl. 521, 527 (2003). These exceptions include suits

> by an intended third-party beneficiary, by a subcontractor by means of a pass-through suit when the prime contractor is liable to the subcontractor for the subcontractor's damages, and by a Miller Act surety for funds improperly disbursed to a prime contractor. . . . [T]he common thread that unites these exceptions is that the party standing outside of privity by contractual obligation stands in the shoes of a party within privity.

*First Hartford*, 194 F.3d at 1289 (internal citations omitted).

Plaintiff responds that privity of contract with the Government is not required and that "[t]he requisite waiver of sovereign immunity is furnished by the Tucker Act." Pl. Br. at 6. In support of this theory, Plaintiff relies exclusively upon the Federal Circuit's opinion in *Insurance Co. of the West v. United States*. In his brief, Plaintiff quotes from the following statements:

> The language of [the Tucker Act] contains an unequivocal expression waiving sovereign immunity as to claims [founded upon contract], not particular claimants.

*Ins. Co. of the West*, 243 F.3d at 1373-74. And further:

> [T]he Tucker Act must be read to waive sovereign immunity for assignees as well as those holding the original claim, except as barred by a statutory provision such as the Anti-Assignment Act.

*Id.* at 1375; *see* Pl. Br. at 6.

In *Insurance Co. of the West*, the Federal Circuit discussed in great detail a Federal Tort Claims Act case, *United States v. Aetna Cas. & Sur. Co.*, 338 U.S. 336 (1949). Although not cited by Plaintiff, the *Insurance Co. of the West* court appeared to give *Aetna* an expanded reading that supports the Plaintiff's theory:

> [W]e think that *Aetna* reflects a broader and more generally applicable legal principle: waivers of sovereign immunity applicable to the original claimant are to be construed as extending to those who receive assignments, whether voluntary assignments or assignments by operation of law, where the statutory waiver of sovereign immunity is not expressly limited to waivers for claims asserted by the original claimant.

243 F.3d at 1373.

We disagree with Plaintiff's reading of *Insurance Co. of the West.* We regard the expansive language cited above as dicta. It is quite clear that the Federal Circuit's holding was far more limited than Plaintiff contends. *Insurance Co. of the West* revolved around the status of subrogees after the Supreme Court's decision in *Department of the Army v. Blue Fox, Inc.*, 525 U.S. 255 (1999), which appeared to undermine the subrogee exception to privity. The court defined the question presented as limited to subrogation, not all assignments:

> This case requires us to decide whether a subrogee, after stepping into the shoes of a government contractor, may rely on the waiver of sovereign immunity in the Tucker Act, 28 U.S.C. § 1491, and bring suit against the United States.

*Ins. Co. of the West*, 243 F.3d at 1369. Its holding is likewise limited to subrogees:

> [W]e conclude that a subrogee, after stepping into the shoes of a government contractor, may rely on the waiver of sovereign immunity in the Tucker Act and bring suit against the United States.

*Id.* at 1375.

Despite the broad language the *Insurance Co. of the West* court used in describing the legal principle reflected in *Aetna*, that court also recognized that *Aetna* concerned itself only with the issue of privity with respect to subrogees. *Ins. Co. of the West*, 243 F.3d at 1373 ("*Aetna* thus directly held that Congress's waiver of sovereign immunity under the Tort Claims Act included suits by subrogees.")

Subsequent cases decided by this Court and the Federal Circuit evidence no support for Plaintiff's broad reading of *Insurance Co. of the West*. The five cases to date that have discussed *Insurance Co. of the West* in detail have all stated that the holding of that case was limited to reaffirming the long-standing doctrine of equitable subrogation. *See Fireman's Fund Ins. Co. v. England*, 313 F.3d 1344, 1352 (Fed. Cir. 2002); *Liberty Mut. Ins. Co. v. United States*, 70 Fed. Cl. 37, 42-43 (2006); *Nova Cas. Co. v. United States*, 69 Fed. Cl. 284, 296 n.12 (2006); *U.S. Fire Ins. Co. v. United States*, 61 Fed. Cl. 494, 500-01 (2004); *Westchester Fire Ins. Co. v. United States*, 52 Fed. Cl. 567, 574 (2002). No court has read *Insurance Co. of the West* as providing an exception to the privity requirement for all assignees. Moreover, the Federal Circuit has continued to affirm the privity requirement in other contract litigation. *See S. Cal. Sav. & Loan*, 422 F.3d at 1328).

### B. Anti-Assignment Act

Defendant also asserts that the Centennial-Centers assignment violates the plain language of the Anti-Assignment Act. From the earliest days of the Act, the Supreme Court made it clear that the plain language of the Anti-Assignment Act is not controlling. Rather, courts should consider whether the assignment in question implicates the purposes of the Act. *Goodman v. Niblack*, 102 U.S. 556, 560-61 (1880); *see also Aetna*, 338 U.S. at 373 ("The rigor of this rule was very early relaxed in cases which were thought not to be productive of the evils which the statute was designed to obviate.").

The Anti-Assignment Act consists of two provisions: the Assignment of Contracts Act, 41 U.S.C. § 15(a), and the Assignment of Claims Act, 31 U.S.C. § 3727(a), (b). The Assignment of Claims Act, which is applicable here, provides:

> [A] transfer or assignment of any part of a claim against the United States Government or of an interest in the claim . . . may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued.

31 U.S.C. § 3727 (a), (b).

The prohibition against assignment of claims was designed to protect the Government from "frauds and mischiefs." *Spofford v. Kirk*, 97 U.S. 484, 489 (1878). The original and now somewhat archaic purpose of prohibiting assignment was "to prevent persons of influence from buying up claims against the United States, which might then be improperly urged upon officers of the Government." *Aetna*, 338 U.S. at 373 (citing *Spofford*, 97 U.S. at 490). Over the years, the courts have recognized additional purposes:

> [To] enabl[e] the United States to deal exclusively with the original claimant instead of with several parties, thus obviating the necessity of having to inquire into the validity of specific transfers or assignments of the claim, minimizing subjection to successive litigation upon the same claim, and eliminating the risk of double payment or multiple liability.

*Patterson v. United States*, 173 Ct. Cl. 819, 823 (1965); *see also Aetna*, 338 U.S. at 373; *Am. Nat'l Bank & Trust Co. v. United States*, 23 Cl. Ct. 542, 546 (1991) (purpose of the Act is "to protect the Government from secret assignment arrangements, to prevent possible multiple claims, and to make unnecessary the investigation of alleged assignments"). A further purpose of the Anti-Assignment Act is to preserve the Government's defenses against the assignor by way of set-off or counterclaims that the Government would not have against the assignee. *United States v. Shannon*, 342 U.S. 288, 291 (1952).

The Anti-Assignment Act is thus not mechanically applied where the assignment in question does not implicate any of these purposes. *Rel-Reeves, Inc. v. United States*, 221 Ct. Cl. 263, 273 (1979) ("[R]ecent judicial interpretations of the Act . . . necessarily consider the types of assignments which the Act sought to eliminate in reaching a decision regarding the validity of the assignment under scrutiny."). A number of such situations have been recognized as exceptions to the Act. They include: claims assigned "by operation of law," such as those that pass to "heirs, devisees, assignees in bankruptcy, or receivers," *Seaboard Air Line Ry. v. United States*, 256 U.S. 655, 657 (1921); claims assigned as part of a "merger or consolidation of corporations as the various states might authorize for the public interest," *id.*; and assignments to stockholders in the course of distribution upon dissolution of a corporation. *Novo Trading Corp. v. Comm'r*, 113 F.2d 320, 321-22 (2d Cir. 1940). Plaintiff does not fall into any of these recognized exceptions.

Plaintiff relies primarily upon this Court's decision in *National Australia Bank v. United States*, 54 Fed. Cl. 238 (2002), to support his argument. Pl. Br. at 8-9. In that case, a parent corporation, National Australia Bank, was assigned the claim of two wholly owned subsidiaries when National Australia Bank sold the subsidiaries. *Nat'l*

*Austl. Bank*, 54 Fed. Cl. at 239. One of the issues in that case was whether the subsidiary corporations could substitute National Australia Bank as plaintiff on the assigned claim in a suit against the government. *Id.*

The court held that the transfer of the claim from the subsidiaries to the corporate parent/owner National Australia Bank was analogous to the situation where "a claim is transferred to a different corporation by virtue of a merger or sale, an event which does not trigger the Anti-Assignment Act." *Id.* at 239. The court held that National Australia Bank's receipt of the claim was analogous to a transfer by operation of law. *Id.* at 240. The court held that the transfer was not prohibited because it did not violate any of the underlying policies of the Anti-Assignment Act. *Id.*

Plaintiff argues that there is no meaningful distinction between the assignment in *National Australia Bank* and the assignment in this case and that the result should therefore be the same. Pl. Br. at 8-9. We agree with Plaintiff that the circumstances of the assignments are parallel. In our case, the wholly owned corporation was sold to another owner, with the claims being transferred as an asset to the original owner. That the former and current owners of the corporation are here individuals, and not corporations as in *National Australia Bank*, does not seem to us significant for the purposes of the Anti-Assignment Act.

We decline to follow the court's decision in *National Australia Bank*. We think that transfers such as these implicate one, and perhaps two, of the recognized policies behind the Act. First, voluntary assignments such as the Centennial-Centers assignment present the possibility of double claimants. Indeed, in our case that possibility became manifest when Centennial sought reimbursement from HUD even after the assignment. CSUF ¶ 11. That the subsidiary corporations in *National Australia Bank* did not attempt to recover on the assigned claim should not obscure the fact that the Government was vulnerable to multiple claimants and double payment. It is the very possibility of multiple claimants that the Anti-Assignment Act is intended to prohibit.

Second, these transfers may adversely affect the availability of defenses and set-offs that the Government would have had against the assignor. In this case, HUD may have lost the ability to raise defenses and set-offs available vis-à-vis Centennial with respect to the claim now being advanced by Mr. Centers. Under the law of assignments, the Government's defenses in a suit by Mr. Centers would be limited to those offsets and counterclaims against Centennial that existed at the time of the assignment. *Am. Lumber Corp. v. Nat'l R.R. Passenger Corp.*, 886 F.2d 50, 55 (3d Cir. 1989). The Government would lose those defenses and counterclaims that arose after the assignment. No such limits exist if Centennial sues on its retained claim.

Plaintiff also cites two additional cases, *United States v. Improved Premises Located at Northwest Corner of Irving Place and Sixteenth Street*, 204 F.Supp. 868 (S.D.N.Y. 1962), and *Novo Trading Corp.*, 113 F.2d 320, in his Anti-Assignment Act discussion. Plaintiff does not explain why these cases support his argument that the Centennial-Centers assignment does not violate the Act. Both of these cases concern the application of the Act to assignments to stockholders upon the dissolution of a closely held corporation. As noted above, these cases fall within a recognized exception to the Act. The assignment at issue in this case does not fall within this recognized exception because it was not made upon the dissolution of the corporation.

**C. Statute of Limitations**

The Government also contends that the filing of this action occurred more than six years after the claim arose – December 1993 – and thus is barred by this Court's statute of limitations.

The Tucker Act's six-year statute of limitations operates as an express limitation on the Federal Government's waiver of sovereign immunity for non-tort monetary claims against the United States. *See* 28 U.S.C. § 2501; *Hart v. United States*, 910 F.2d 815, 817 (Fed. Cir. 1990). This jurisdictional restriction is an essential element of a plaintiff's claim under the Tucker Act that must be strictly construed, and may not be waived by either the court or the parties. *See, e.g.*, *Forman v. United States*, 329 F.3d 837, 841-42 (Fed. Cir. 2003).

Under the Tucker Act, a claim accrues, and the statute of limitations begins to run, "when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." *Brighton Vill. Assocs. v. United States*, 52 F.3d 1056, 1060 (Fed. Cir. 1995) (quoting *Kinsey v. United States*, 852 F.2d 556, 557 (Fed. Cir. 1988)); *see also Bowen v. United States*, 292 F.3d 1383, 1385 (Fed. Cir. 2002).

Plaintiff's claim is based upon HUD's alleged breach of the contract of insurance when HUD failed to reimburse Centennial the $202,730.33 it paid following the Indiana state court's decision. It has long been held that "where a claim is based upon a contractual obligation of the Government to pay money, the claim first accrues on the date when the payment becomes due and is wrongfully withheld in breach of the contract." *Oceanic S.S. Co. v. United States*, 165 Ct. Cl. 217, 225 (1964).

Centennial first requested reimbursement by letter in March 2000. CSUF ¶ 11. HUD first denied Centennial's request on June 7, 2000. *Id.* We conclude that this refusal triggered the statute of limitations.

At the date the Government contends Plaintiff's claim first accrued, December 1993, Centennial had suffered no damages – between HUD's payment under the contract of insurance and Centennial's draw on the letter of credit, Centennial was made whole. The Government's suggestion that Centennial sue HUD before the draw on the letter of credit was determined to be improper "just in case," *see* OA Tr. at 30-32, is not realistic. And although the Plaintiff urges a later date than June 7, 2000, based on the date of the third and final rejection letter by HUD of December 20, 2003, he offered no persuasive explanation why the first rejection was not sufficient to precipitate the claim. *See* OA Tr. at 56-57. Plaintiff filed his claim in our Court on June 1, 2005, within the six-year statute of limitations.

## CONCLUSION

This Court does not have subject matter jurisdiction over Plaintiff's claim under the Tucker Act, because Plaintiff is not in privity of contract with the Government and therefore does not have standing to bring this suit against the United States.

**For the foregoing reasons, the Defendant's Motion to Dismiss is GRANTED.**

**IT IS SO ORDERED.**

/s/ Lawrence M. Baskir
LAWRENCE M. BASKIR
Judge